We'll turn now to 25-2053, U.S. v. Valdez. Good afternoon, your honors, counsel. My name is Amanda Skinner and I'm here for Mr. Valdez. Our argument in this case is really based on a lack of reasonable suspicion for the stop, detention, and pat-down of Mr. Valdez. And we also have an argument regarding some late disclosure by the government, but I'd like to start with the reasonable suspicion issue. The district court focused on the following factors to support a finding that there was criminal activity that may be afoot. First, that the whole South Valley area of Albuquerque is a high-crime area, that Mr. Valdez matched the description that a resident gave of a young man who knocked on her door to retrieve a bag that he had thrown in her yard the night before, that after retrieving it, he remained in the neighborhood for several hours and seemed agitated, that he looked in the window of a car for sale, reached into his duffel bag, displayed nervousness, and had body movements that a deputy had interpreted as an indication that he might flee. But all of this taken together, even in a totality of the circumstances analysis, is not enough to support a finding that criminal activity may have been afoot. First, this was 8.30 in the morning in a neighborhood with a park nearby. The caller, while she allegedly stated that she was concerned about casing during the phone call, when push came to shove and things got serious and detectives or deputies were at her door, she gave a written statement where she doesn't mention casing at all. And you can read that statement as really a concern for Mr. Valdez. She notes that he knocked on the door and asked her to get his bag, which he said that he had left because someone was chasing him. And she said that her call to the sheriff's department was prompted because he seemed agitated as he loitered. And this caused me concern. I'd like to see her as someone who was concerned for Mr. Valdez. The other factors cited by the district court, you know, remaining in the area, again, there was a park nearby. Can I stop you at the bag? Yes. Please. What other, what is happening with the bag? Well, I mean, that's such a great question. We don't really know. And I think to assume that this was criminal is a real leap in logic. That is a violation of Mr. Valdez's constitutional rights. He had a right to be free from search, an unreasonable search and seizure, even if he's strange or doing something odd. And so you admit knocking on somebody's door and retrieving a bag. That's unusual. It's a strange sequence of events, but he wasn't aggressive with the homeowner. He didn't trespass in her yard. He was polite. And this this discussion of the high crime area, you know, no one ever really connected this to burglaries, car thefts, home invasions. It's just a blanket statement that this is a super high crime area and this man is hanging around near a park. So without more, you know, we acknowledge that it's a low bar, but under Daniels, we still have a particular. We still have a requirement for a particularized and objective basis that's always required for reasonable suspicion. So back to the bag. I guess you're conceding it's unusual, but not suspicious. Yes, I would concede that it's unusual and not not criminally suspicious. The government had a comment in their response brief because I had made an argument in our opening brief that, you know, the district court's determination that a person who threw a bag in a stranger's yard at nighttime while running from someone may be armed and dangerous while in possession of that bag, because the bag contains something that the person wishes to hide from others, such as drugs, weapon or contraband. We argued this conclusion is clearly erroneous. If he had a weapon, he could have protected the bag. And the government in their response said, well, well, that's our argument right there. He somehow got a weapon that night, went back to get the bag. And that's a you know, that certainly could be an explanation. But we don't have anything from the homeowner or from the officer's observations of Mr. Valdez that would lead you to believe that he was armed. And so I think we can speculate as to why he did this. But in and of itself, you know, he's not trespassing in the person's yard. He's cooperative. And her statement actually also said that he was walking in the neighborhood. Again, this is a this is a public area and people have a right to be strange or odd to live in a high crime area, to live in a poor area and still look at cars that are for sale. I mean, I have a real issue with the fact that a lot of this stop is justified because he was near a vehicle that was clearly for sale. That was the district court's finding was that this was clearly a vehicle for sale. There is a sign in the window and he approaches that vehicle. And one of the movements that the officers and the district court had an issue with was that when they called out to him and told him stop reaching in the bag, he dropped the bag or he he had dropped the bag and he picked it back up. So no one says he reached in it again after he was told to stop. But he did reach in a pocket as soon as he noticed the officers. It appears that he reached in his pocket and he did that to pull out his cell phone. And the testimony and the district court's finding was he pulled out that cell phone and lifted it up for the officers and pointed in it, pointed to it as if to say, I'm just looking at this car for sale. I want to call this number. And I think it's important that in the district court's findings, which are numerous, starting at number 15 in the district court's order, they talk about the officers not being sure where this individual was. So they left the residence home and hung out in the area around Shadyside Park, which was very near the caller's home. And the district court never says when Mr. Valdez allegedly noticed the officers. And there's video that the court can review, but it's also laid out really well by the district court. And if you read the findings, the argument, the comments about him being nervous or looking around, the district court doesn't say that that's in response to seeing officers. So it's sort of unclear. What does that nervousness tell us? You know, was Mr. Valdez hungry and thirsty? Was he lost? Was he looking for this car for sale that someone had told him about? There's a lot of speculation here. But I think the time of day, the lack of specificity with respect to why we're concerned about Mr. Valdez and his behavior specifically, when all we're saying is just high crime area. I don't know that that's enough for the officers to get reasonable suspicion. And here we have the added problem of these two officers really not reaching the standard that was set in Terry, where we have officers with 30 years experience who are testifying confidently about, you know, what they know from their observations and training. This officer, as the district court sort of joked with trial counsel, he really gave you something there. You know, trial counsel, he admitted that he's patting down everyone. This officer has a personal policy to pat down every single person that he encounters. And he made that decision before he even got to Mr. Valdez. And the officers also made the decision, according to the district court's findings, to block in Mr. Valdez before it's clear that he even noticed them. So we have really here a detention and a decision to pat down based on conduct hours earlier, tossing a bag, I'll give you that it's strange and odd, but then politely knocking on a homeowner's door near a park, asking for the bag back, and hanging out in the area and going about his day to look at a vehicle that's for sale. So that, you know, all of those things even taken together, the district court determined that looking at the vehicle for sale is innocent conduct, but under totality of the circumstances determined that, you know, this was going to be enough for reasonable suspicion. But I think that this case is really in stark contrast to two decisions from this court, Daniels and Johnson. Johnson, first of all, could not be more different. That is in an area known in the Albuquerque area as the war zone. It's smaller than the entire South Valley, and the war zone specifically was known for concerns with prostitution. And a caller called in and basically reported child abuse happening in real time. There's a grown man with what looks like a teenage girl. It's the middle of the night. He's pushing her down the street. I'm concerned you need to send someone. In Johnson, the officers did much more investigation than the officers did here for Mr. Valdez. They actually encountered Mr. Johnson, and before detaining him or cutting off his path of exit, they tried to engage with him, and while they're engaging with him, they notice that he has a walkie-talkie and he's depressing buttons back and forth. Very suspicious, especially in this area with these specific crime concerns at that time of night. And so, you know, very different than Mr. Valdez's situation. And in Daniels, this was a case where the defendant actually prevailed and argued that a caller's report of three men in a parking lot passing guns back and forth, looking like they were about to do something, was not enough to develop reasonable suspicion. And so I would submit that even if, you know, this court is convinced that the mention of casing in the phone call would be enough, in Daniels it wasn't enough for a caller to be so concerned that she called and said, look, they've got guns and they are about to do something. And I think post-Bruin, we have an interesting line of case law developing that flashing a gun is not going to be enough when we're talking about Second Amendment rights and people's right to bear arms, you know, specifically in New Mexico. So it almost is as if, you know, individuals like Mr. Valdez, who don't have a threat of a weapon or a possibility of a weapon, somehow have to reach a higher standard when arguing against reasonable suspicion. But if he had had a gun, we all could have agreed that that's not going to come into the calculus. Counsel, could you address the inevitable discovery argument? Thank you, Your Honor. This is—the timing here is interesting, and so I understand the government's arguments in the response that, you know, why isn't all of this just saved by inevitable discovery? The way we see it is before—this court could rule that there was reasonable suspicion to stop Mr. Valdez as soon as they got his Social Security number and name. We concede they were going to run it and he was going to be arrested on those warrants. So perhaps this court could say that what was found on his person is usable against him. But the argument on what was found in the bag is not saved by inevitable discovery because our argument is that the district court either committed plain error or abused its discretion in treating a late document dumped by the government as an affirmative motion to reconsider. I agree that the district court can sua sponte reconsider a ruling, but that's not what happened here. This wasn't the judge going back and thinking about it. This was the judge being given documents that the government had every opportunity to submit at the hearing. And that's why I'm a little bit confused about why you don't want this to be construed as a motion to reconsider. If it's construed as a motion to reconsider, you know, we typically don't grant motions or affirm the grants of motions to reconsider on the basis of evidence that was already available, which I understand would be your argument. So you have that, but then you're arguing that it was plainly erroneous for the district court to construe this as a motion to reconsider. So help me better understand your argument. Thank you, Your Honor, and I think it's two separate arguments. You know, we briefed plain error on an abundance of caution because trial counsel did, I would say, did object. They filed a motion to strike. They said, this is late. We've already been through this. Why are we getting all of this now? And that motion to strike was denied. There was some talk about potentially having another evidentiary hearing offering defense counsel something if they wanted to develop the argument, and that didn't happen. So I think if it was, we are not saying that it couldn't be construed as a motion to reconsider. If it was construed as a motion to reconsider, that's where our argument that it was an abuse of discretion comes in. So if this court sees that that was a proper, that that late disclosure by the government with no argument, no analysis, and no request was a motion to reconsider the oral ruling, then we would argue that granting that was an abuse of discretion under this circumstance. What is our standard of review, I suppose, for a district court's understanding of the motion to strike as a motion to reconsider? Do we defer to that? I don't think that it impacts the analysis because we're not arguing that it was erroneous or an abuse of discretion, basically, to deny the motion to strike because the district court... And that's not on appeal, is it? Right, no. And the district court made it clear, I'm considering this a motion to reconsider. So that's why we went with a plain error argument that it's not a motion to reconsider. Yes, there is an ability to ask for reconsideration just developed through our system, even though there's not a rule about it. But if it was properly a motion to reconsider, it was an abuse of discretion to grant it under these circumstances. And I see that my time is up. Thank you. Mr. Federici. Good afternoon, Your Honors. My name is Fred Federici. I'm an assistant U.S. attorney from the District of New Mexico, and it's my privilege to be able to speak to you this afternoon on behalf of the United States. I'll start where opposing counsel started with respect to first addressing the reasonable suspicion for the initial stop. Your Honor, we would say that Judge Browning might have said it best at the suppression hearing when he said, quote, guys don't throw bags into backyards unless there's something in there suspicious, close quote. It's just not the sort of conduct that triggers a reasonable person to conclude that perfectly innocent activities are afoot. Because the universe of people who knock on a stranger's door and ask to retreat a duffel bag from the stranger's yard that they threw in the yard the night before while running away from someone who aren't up to no good or involved in some sort of criminal activity has to be zero or approaching zero. And it's this bedrock core fact that set off alarm bells in the tipster about the defendant's behavior, which is only the start of the totality of the facts that justified the deputy's initial stop of the defendant. But still, as Judge Browning said, and it's been random opinion, throwing a bag into a stranger's yard is suspicious activity in and of itself. But as counsels talked about, the other facts that the deputies knew before they stopped the defendant included that he was in a high crime area of the city, the South Valley, that he had stayed in the area for several hours after his encounter with the tipster earlier that morning, that the tipster reported to Deputy McCloud as he testified that the defendant appeared to be casing the neighborhood, and then in her written statement that she followed up with later added that he seemed agitated as he loitered. The deputies also observed for themselves how the defendant was looking at the car in the empty lot, which concerned them that he might be considering burglarizing it. And Deputy Dinger also testified that as they were driving toward the defendant, they had two separate cruisers. The defendant began looking around nervously, shifting his body weight, and reaching into his pockets, which to Deputy Dinger is common if somebody's looking for an avenue of escape, which is why Deputy Dinger decided to pull his car to one end of the lot while Deputy McCloud was at the other. And reaching into his pocket, Deputy Dinger perceived, could be for the purposes of grabbing something or trying to get rid of something. And of course, as opposing counsel also talked about, reasonable suspicion is not a high bar for the government to meet under these circumstances. Again, it requires more than a hunch, for sure, but considerably less than proof of wrongdoing by preponderance of the evidence. And an officer doesn't have to rule out the possibility of innocent conduct for reasonable suspicion to exist. An officer doesn't even have to have evidence suggesting a fair probability that criminal activity exists. So starting with the defendant's highly suspicious conduct in throwing a duffel bag into someone's yard while running away from somebody, and the low legal threshold the government has to meet to justify a Terry stop, it's our position that it really wasn't a close call for Judge Browning to rule that an investigatory detention was justified. And we'd also say that the leap between Judge Browning's finding that there's reasonable suspicion to justify the defendant's initial detention and his finding that a reasonably prudent officer could also reasonably suspect that he was armed and dangerous also wasn't a wide chasm for Judge Browning to have to cross. And that's opposing counsel referred to Judge Browning's finding that it was reasonable for the deputies to suspect that a person who threw a bag into a stranger's yard at nighttime while running from someone might be armed and dangerous because the bag was likely to contain something that the defendant wished to hide from others, such as drugs, weapons, or other contraband. Again, Judge Browning perhaps said it best at the motion hearing. Quote, I think that probably most people would think that thing contains drugs. Close quote. Where you have drugs, guns are rarely far behind. But even beyond that base fact, again, the deputies had more. They had the high crime area. They had the description that the defendant appeared to be casing the neighborhood for a couple of hours before the neighbor called the police. And the deputies also noticed him shifting his weight suspiciously as if, in their view, he might be looking for an escape route. And then they saw the defendant first reaching into his duffel bag, then picking up the duffel bag, and then putting his hands in his pockets. So again, we think that Judge Browning's findings on reasonable suspicion are fully supported in the record. And with respect to plain error, we think that the defense argument that Judge Browning plainly erred is really just a non-starter. Can you tell me what the government thinks it filed when it asked for Judge Browning to consider additional evidence that would support the inevitable discovery doctrine here? Well, what we captioned it as is a notice of supplementary exhibits. And then the body of the document referred that it was supplementary to the United States' response to the defendant's motion to suppress. And then one of the center points of that filing was simply, I think, to alert Judge Browning that what he had said the day before at the status conference wasn't consistent with what the deputies actually said. In other words, he misapprehended the record. And to correct that, one of the things that the government did was to attach the transcript of the actual sentencing hearing and then identify for the court the parts of the deputy's testimony that we wanted the judge to look at more closely again. And specifically, Your Honor, at the April 25, 2022 pretrial hearing, Judge Browning announced that he was reversing the initial decision that he had indicated he was going to rule in favor of the government. Because in part, based on the deputy's testimony, he believed that there was no indication that the deputies would have conducted a second lawful search. However, after having the opportunity to review the transcript and the parts of the transcript that the government pointed out for the court to read or reread, by the time Judge Browning wrote his memorandum opinion in order, he wrote, quote, both McLeod and Dinger's testimony support the court's conclusion that it is standard procedure for officers to conduct an inventory search of an arrestee's property before they are booked. Consequently, the court concludes by a preponderance of the evidence that the officers would have performed an inventory search of Valdez's bag before his booking. And that's in the record on appeal in the first volume on pages 188 through 89. But you didn't just provide some further clarification to straighten out anything you think the district court may have missed. You presented additional evidence that was available to you that you could have presented at the hearing. That's true. The core of what was presented, however, was simply, we think, re-presenting to the court that which he'd already heard and we believe misapprehended, as illustrated by the quotation I just gave to the court. So it seems that notwithstanding what it was labeled as, if I understand correctly, the government was endeavoring to have the district court revisit, reconsider its ruling. Is that correct? The government was endeavoring to have the court not misapprehend the record and then get to the point of what Your Honor is talking about, yes. Okay. So is the government's position that Judge Browning properly or within his discretion understood your request as a request to reconsider his ruling? He certainly understood the context and meaning of it because part of the context and meaning of it was to express to the court, Judge, we think you've got it wrong in terms of what this record looks like. Would you please look at it again and take a second look, which he did, and reverse course a second time. So there's no new law issue here, right? There was no new argument raised by the government in the way that there was in Huff, correct? No, we had originally argued both for an inventory search and an inevitable discovery. That's correct. So the legal arguments remained static and what was in motion was the government's presentation of evidence to support the legal argument, right? That's true. And we typically do not allow reconsideration based on new evidence that was previously available. It's evidence that's previously unavailable. And so what I'm struggling with is, and help me understand how to endorse your position in light of my concern. If we understand this as a motion to reconsider, just as Judge Browning did, then how is it proper to grant it on the basis of evidence that was previously available to the government that you failed to present? Well, in part, Your Honor, I feel like I've answered part of it simply to say that I think that the government should always have the opportunity to course correct or to prevent the court from making a mistake with regard to how the court is reading the record. And we do believe, based on what I had just read, that the court recognized that and changed direction. But there's more than that. Because Judge Browning, and it's really not addressed by the defense at all, gave a perfectly reasonable and rational explanation of why it is that he changed his mind. And it was based on the Huff decision in large measure. He recognized first that he had wide discretion whether to reconsider his decision, whether that was triggered by a notice from the government or by an actual motion to reconsider, which he indicated hadn't been filed yet because he hadn't even filed his motion in order. He explained that he understood that the exclusionary rule is meant to deter policeman misconduct, and when there is a legal basis for justifying a search, there's little rationale for applying the exclusionary rule, again, directly from this court in Huff. Second, and I think this is an underappreciated part of this record, he recognized the government's argument that the defendant hadn't challenged the government's inventory search and inevitable discovery arguments other than as a fruit of an investigatory stop that lacked reasonable suspicion. In other words, at the suppression hearing, the defendant all but conceded that if the government prevailed on reasonable suspicion, it would necessarily prevail on its inventory search and inevitable discovery arguments too. So Judge Browning explained, as part of the reason for why he reversed course, that he didn't want to punish the officers or the government on the prosecutorial oversight and arguably reward the defendant for not challenging those arguments earlier. By the time we get to the end of this, the defendant doesn't acknowledge that, much less address or explain that. So we do believe that Judge Browning, certainly consistent with Huff, explained why his decision to reverse himself was reasonable and not an abuse of his discretion. Let me, I have to interrupt because my understanding of the law is quite different from what I'm hearing here. The district court in a civil or criminal case can change its mind at any time before final judgment. And there's no problem with the party asking the court to change its mind for whatever reason. Even if it just thinks it has a better argument on the same issue, it can present new evidence and so on. It can do any of those things. It's not improper to file such a motion. If you are filing a motion and pointing to evidence that was available before or an argument made before, then it's not abuse of discretion for the court to say, sorry, I've heard, you know, you should have presented that to me before, you should have made that argument before, you've already made that argument, those things. Then it's okay for the judge to just say, I'm not going to consider it for that reason. But I don't think there's any support for the proposition that a judge cannot reconsider because the motion doesn't fit those requirements that we've been talking about. We agree, Your Honor. And Judge Browning quotes the Supreme Court that talks about the wisdom of allowing district judges to reconsider decisions that they've made. And for those reasons, I see my time is expiring. We'd ask that the court please affirm Judge Browning's ruling. Thank you, Counselor. Case is submitted. Counselor excused.